Good morning. I'm Jay Scott Vovitz. I represent John von Gunten. Mr. von Gunten is present. It's kind of hard in 10 minutes to tell a story that's as complicated as this, but it's my birthday and I'm going to take a stab at it. Mr. von Gunten is a man and the testimony on this arises on a motion for summary judgment from down below in the Bankruptcy Court. We went through the District Court. We did not have oral argument there. And the District Court gave a kind of summary approval of the Bankruptcy Court's action. Mr. von Gunten met Reed Slatkin. Mr. Slatkin was one of the richest men in the United States for a while. According to Forbes, he made money on Earthlink. He was quite a charismatic fellow. Before he met Mr. Slatkin, John von Gunten set up a company called Von Gun Ink Services. We call it VGIS for simplicity. Von Gunten Ink Services has always been separate from John, a completely separate company. The testimony below, uncontradicted, is that it was his company, separately maintained, separate bank accounts, all the corporate formalities were followed. Then in 1990, a mighty long time ago, not 2000, but 1990, we have a letter agreement between Mr. von Gunten, the man, not the company, and Mr. Slatkin. Mr. Slatkin becomes, if you will, a stockbroker for him. Now, not a stockbroker because he's taken a Series 7 and whatever. What happens is he promises to buy securities on account of Mr. von Gunten. That's in the record. And John, the man, starts to give money, ultimately gives $248,693, almost $249,000 to Mr. Slatkin. Now, we never go to trial. Mr. Slatkin is in the pokey and we haven't had a chance ever to depose him. There was discovery pending at the time that we, the motion for summary judgment was granted. We don't really know whether some shares of stock were being purchased or not. Mr. von Gunten believed. You just said a number here. My understanding was, is there any disagreement that Mr. von Gunten and VGS invested $180,000, but Slatkin received a total of $565,000? That would be incorrect. You're disputing that then? That amount? Yes, the amount. I can tell the Court the exact amounts. The exact amounts are that John, the man, gave $249,000, approximately, to Mr. Slatkin, and VGIS, the entity, gave $51,000, approximately, $51,318. Then, may I go back to my sequence or do you want me to break it down? No, that's fine. Okay. You know, what I don't understand about the case is, even if there are two entities, why couldn't the bankruptcy judge issue judgments against both the individual and the corporation? The bankruptcy court, if there was ground, certainly the bankruptcy court could have issued a judgment against VGIS for $179,000 or, as we would say, $179,000 less, the restitution, rescission claim, and a separate judgment against John based on the timing, looking at the statute of limitations and deciding where to draw the line, and could have issued separate judgments, and should have, rather than issuing one merged judgment where the human being is responsible. If the judge was right about the statute of limitations issues, I know you dispute that. We do. But assuming for the sake of argument that the judge correctly applied the statute of limitations, the reach-back periods and so forth, does it make any difference that the judgments were issued against the parties, against the corporation and the individual as it was? Is there any practical difference? $179,000. Is one judgment collectible and one not? Actually, VGIS has very few assets. It's a professional service corporation. It has a computer and some other miscellaneous things. So, yes, as a practical matter, in terms of enforcement of judgment, it would be more difficult for the trustee to enforce the judgment against VGIS. And then I suppose at some point they could try to show that, try to pierce the corporate veil if that were the case? Right. That was not pled. And we had talked about, it was interesting, the alter ego issue, not pled and, in fact, no evidence that there should be a division. We're talking about many, many years of following corporate formalities. And so the question was, why should it be responsible? Well, under 550, this odd section we have in Bankruptcy Code, avoidability and then recovery. They're separated under Section 550. Under 550, if there was a transfer to VGIS and then a transfer to John from VGIS, a direct transfer sort of passing through the bank accounts, there's an argument that Mr. Von Gutten would be responsible. No proof with respect to a transfer from VGIS with respect to these various monies. So they have to show that John is responsible because he was, quote, an entity for whose benefit the transfer was made, close quote. An entity for whose transfer the benefit was made would mean if United Airlines was the recipient of a preference in a case in Tennessee and United Airlines received $100,000, all of the shareholders of United Airlines would suddenly be responsible, would be entities for whose benefit that preferential transfer was made. Now, the bankruptcy court said, no, no, no. This is not a big airline case. This is a little teeny case. And somehow that's distinguishable from United Airlines. No question about the corporate formalities. No question about the separate legal existence of John, a human being, and VGIS, a corporate entity. But under 550, as I understand it, we look to the question of does Mr. Von Gutten receive a benefit? And if he's the sole shareholder, officer, director of VGIS, then he's receiving a benefit. No. You seem to be going down the pure corporate analysis. And it strikes me that the real question is the 550 analysis. Well, I think not. And the reason is I put that little hypothetical in my brief. If you have an asset, if you have a balance sheet for VGIS, it has one asset which is a receivable from Mr. Slack. And whether it's a claim to securities or a claim to money, it has a claim for $100,000. If it receives $25,000 in cash, now it puts it in the VGIS bank account. And the financial statement changes. It has a $75,000 receivable and a $25,000 hunk of cash. Same balance sheet. So the value of shares to John in the company is exactly the same. Assets that are collected versus accounts receivable all go in the balance sheet as positive assets. Now, if it ultimately is uncollectable, that's a different thing. But here we're talking about there is no advantage from an accounting standpoint. I'm glad I took that accounting class at law school to look at that. Now, as a practical matter, it's good that money is flowing into John, and this is evidence of his good faith. Many years there are payments. Going back, if I may, argue about the statute of limitations for just a moment, and I'm going to waive my right to take that last minute or two as other counsel have done unless the court suggests that I do that. There's approximately $56,500 that's beyond the seven-year period. Again, the trustee in bankruptcy is, for the first three claims for relief, is riding on the Uniform Fraudulent Transfer Act. And there is an absolute bar under 3439.08, an absolute bar to transfers beyond seven years. If you get $378,800, which is what counsel suggests the money judgment was, I can't tell from looking at this judgment. I've got five different pieces. It looks to me like it could be cumulative or something else. The court has to have counted $56,500. That's just outside of the seven years. The four-year to seven-year reachback doesn't work because the trustee can't just pick up the Uniform Fraudulent Transfer Act. The trustee has to have a creditor to ride on the back of. And there the question was, well, who would that creditor be? Who was the creditor in existence at the time of the allegedly fraudulent transfer? Do they still have a claim today? So what evidence is before the court? We have Mr. Reitman's declaration. We know from Lattman, from this court, that trustees, lawyers don't know much. They don't. They have hearsay. They don't have personal knowledge. But there were two declarations that are literally dusted off from the Chapter 11 part of the case, photocopied and put into the record. They would be a declaration of Mr. Poitras and Mr. Honigman. Mr. Poitras' claim arose after the last of the transfers to John. This doesn't help us on VGIS, but it helps us with respect to John. And Mr. Honigman's declaration is, well, my claim arose, it's really a claim of a KEO back in 93. Under 502, which is invoked under Section 550, it has to be a claim that was allowable under state law. And here it's not allowable under state law because I claim whatever that KEO's claim is for rescission or restitution or conversion. It's beyond a four-year period. So we can definitely, a trustee can go back four years and have someone, if you don't strike the declarations completely. I'm on my final minute. Let me say this. This is a difficult case because it's bankruptcy and it's something that's convoluted, and I apologize for violating the ultimate rule of they call the shotgun appeal because I have many issues. I think that Judge Riblett below respectfully missed the boat on about a dozen different issues, any one of which could result in this Court saying, and what I would like this Court to say is, send it back to the bankruptcy court, try the case, have the court resolve these open issues, and set the proper amount of the judgment so I know when we have properly paid it that we're done. And I think that's my time. Thank you. Thank you very much. Good morning. Good morning. May it please the Court, John Reitman appearing for R. Todd Nielsen, the trustee. On a preliminary matter, first, I apologize for being in here a little bit late. I had a very bad fall in Europe three weeks ago, and I can't sit on a wood bench. I was in a chair. Second, I'd like to wish Mr. Bovitz a happy birthday. I don't agree that this is a very difficult case, that bankruptcy is all that complex, or that the issues in this case are necessarily that complex. Let me first take issue. Let me give the Court just one minute of that. Mr. Slatkin operated the longest standing and probably the largest Ponzi scheme in U.S. history. It went on for more than 14 years, and he took in more than a half billion dollars in connection with that scheme. The scheme finally failed when the SEC started an investigation on May 1, 2001. Mr. Slatkin filed bankruptcy. Todd Nielsen was appointed as the trustee. The argument was that Slatkin operated a Ponzi scheme, and ultimately Slatkin pled guilty to that. In a Ponzi scheme, a trustee in bankruptcy can recover the bogus profits that are paid by the Ponzi scheme operator to investors, and he's able to do that under either state law or federal law. In this case, California law and federal law apply. The federal claims are really subsumed within, for all intents and purposes, the federal claims. And Mr. Nielsen sued more than 200 investors who were beneficiaries of Slatkin's Ponzi scheme, including the appellant's heir. He sued them under California law and federal law. Under California law to set aside and recover actual and constructive fraudulent transfers, and the same thing under federal law. One of the confusions that I see in the appellant's argument is a reliance on a case called the sequoia for the proposition that it's an actual fraudulent transfer. You have to have an investor whose claim arose before the transfer was made, and that's simply not true under California law. An actual fraudulent transfer under California law is recoverable by a subsequent creditor. And that, by the way, is Mr. Poitras, and that is important in the context of the seven-year claim. And so that's the framework for this. Can you explain to me on the $56,000 that the bankruptcy court held that you could not reach the $56,000 transferred from Slatkin to Von Gutten prior to May 1st of 1994, but that the amount would be used to reduce Von Gutten's basis to Slatkin? What's the authority for that? How does that work? Well, here's the way it worked, Your Honor. You go back seven years. At seven years, you've got to figure out what did the guy have invested with Slatkin? That's his capital. In the case of Von Gutten and VGIS, they had put in a sum of money and more than seven years before had withdrawn $56,500. All they could have gotten back was part of their principal. So the starting balance is what they put in before the seven years less what they took out before the seven years. And we were faced with a number of different cases, and here were the possibilities. Someone could have put in $100,000 and taken out nothing. Let's assume you did it ten years before the bankruptcy. Starting balance, $100,000. Someone puts in $100,000, takes out $20,000. The starting balance, $80,000. Someone puts in $100,000 and took out $200,000 before the seven-year period. Starting balance, zero. Not a negative, just zero. It's just a math calculation. And it's a math calculation based on the premise that whatever you got paid legitimately could only have been your principal. And so that's how you get to the $56,000 that's not. Mr. Bovitz wants to say we've taken it away from him. What he says is he wants credit for all the money that he deposits, but he wants to ignore any money that's taken out before the seven-year period, which was return of principal. And that's just unfair. I'm not clear why you can get a judgment against the individual for the corporate investments in the absence of a finding that the corporation is the alter ego of the individual. Well, because 550 of the Bankruptcy Code has a different standard. It says you can recover it from the person for whose benefit the transfer is made. And this is not simply, as Mr. Bovitz would have you believe, a case where it's United Airlines and he's a shareholder and that's why he's liable. Now, the evidence here was far more than that. First of all, VGIS was Mr. Von Gutten's personal service company. Number two. What does that mean? It was for his – he was rendering his personal services in whatever business he was through a corporate entity. Okay, but if it's a legitimate corporation, if he's keeping the books separate, then so be it. That's why you can do that. By itself, that might be fine, but those were not the only facts. Again, it's for whose benefit the transfer is made. Well, what are the other facts? What are the other facts? He was the sole shareholder, the sole director, the sole officer. He expressly set up this corporation by his own admission for the purpose of minimizing his personal tax consequences. Well, that's permissible too, isn't it? It is, but there's more. He retroactively changed this. It was his money. He retroactively changed an account in his name to the name of a corporation. And then most importantly, Your Honor, what he does is that he then directs the payments out of the slack in account now in the name of VGIS. Not for VGIS's purposes, but for his own purposes. For example, to rebuild his family home in Puerto Rico. And that's what he testified to. And if – I can't find a clearer case of for whose benefit the transfer is made. This is not simply a corporate shareholder. This is a man who used an asset that he purportedly transferred into a corporate name for his own personal benefit. Slack in makes the distribution to VGIS. VGIS fixes Mr. Von Gotten's home in Puerto Rico. For whose benefit the transfer is made, Your Honor? Well, you don't have to prove to the bankruptcy judge that this was an alter ego situation? Absolutely not, Your Honor. 550 doesn't talk about alter ego. 550, Congress said, we want to get the guy for whose benefit the transfer is made. It's a very expansive view. It's not just the initial transferee, VGIS. In this case, it's also a person who gets the benefit of that transfer. In this case, Mr. Von Gotten. Let me also address for a moment Mr. Bovitz's calculations of damages. What he's done to get the numbers that he gets to is he caused, let me start with two separate accounts here. One is the Von Gotten VGIS account. There also is an account for the Von Gotten Defined Benefit Pension Plan, a separate legal entity. What Mr. Bovitz is doing is he's taking $71,693 that Mr. Von Gotten gave to Von Gotten Services, which in turn made a contribution to the separate legal entity. He's trying to get that credited against a totally different account. The same thing with respect to $51,318 that VGIS contributed for a pension plan. The pension plan is a separate legal entity. It may have a claim for the money that it deposits, but that's not something that the appellants here are entitled to take a credit for. It wasn't their account, and it wasn't their money. That's like saying he gives a gift to Uncle Fred. Uncle Fred makes an investment. Now he says, I want the credit for what Uncle Fred invested. It's Uncle Fred's money. It doesn't work. There's no set-off and there's no recoupment under those circumstances. There's no set-off because there's no mutuality. There's no recoupment because it's a totally separate transaction with separate parties. Let me address for just one moment the qualifying creditor issue. John Poitras did not become a creditor of Mr. Slacken until December 2000. April 2001, he sues Mr. Slacken. May 2001, Mr. Slacken files bankruptcy. Mr. Poitras is a person who could not have, a claimant, who could not have discovered the fraudulent transfers until within one year of bankruptcy. That claim now belongs to the bankruptcy trustee. Under Section 546, the bankruptcy trustee has two years from the petition, date of the petition within which to bring that claim. It's clear. Under the Supremacy Clause, it trumps California law. There is a two-year time period to exercise that seven-year reachback period, and that's what the trustee did. In terms of Honickman, Mr. Honickman didn't have one account. He had two accounts. One was an individual account, which the appellants ignore. They say, well, the Keogh plan isn't a creditor. The Keogh plan is a creditor. Just like Von Gutten Services, Inc. pension plan, it's a trust. It's the same thing. And even if it's not, it belongs to Mr. Honickman. Thank you very much, Mr. Reitman. Thank you. Mr. Bovitz, you've used up your time, but we'll give you a minute in rebuttal. By the way, Your Honors, I just would like to let you know that on the notice that we received, it did say we had 20-minute arguments. Yes. You were out of the room when we shortened the time. Thank you. If I had known that, I would have advised Mr. Reitman of that. We have transfers back and forth. One of the cases cited in our decision is a district court decision from Nielsen versus one of the entities where the court said, you know what, this isn't stock and back and forth. This is hunks of money. You've got a right under United Energy, decided from this court, you've got a right to rescission. You've got a right to restitution if money is paid. There's money paid to forget all the entities, the accounts, whatever it is. It's money from Slatkin to a company. It's money from Slatkin to an individual. And the individual is entitled to a rescission claim. Under the Uniform Fraudulent Transfer Act, under 548, if you pay money to somebody who has a rescission claim or a restitution claim because you stole the money, that's good value, that's good faith, and that is fair consideration coming back. Thank you for the opportunity to make a supplemental 30-second response. Anything else? Happy birthday. Hope you feel better from your fall. The case just argued is submitted. We'll stand and recess for the morning.
judges: Silverman, Callahan, Robart